UNITED STATES of America

v.

NORTH AMERICAN REPORTING, INC., Appellant.

UNITED STATES of America

v.

Richard Lee BOYD, Appellant.

Nos. 83–2024, 83–2025.

United States Court of Appeals, District of Columbia Circuit.

Argued May 30, 1984.

Decided July 27, 1984.

Hamilton P. Fox, III, Washington, D.C., for appellants.

Harriet J. McFaul, Atty. Dept. of Justice, Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Washington, D.C., was on the brief, for appellee. Michael W.

Farrell, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before TAMM, WALD and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In this case, North American Reporting, Inc. and Richard Lee Boyd appeal convictions on eight counts of mail fraud, in violation of 18 U.S.C. § 1341, and eight counts of making false statements, in violation of 18 U.S.C. § 1001. Appellants press two central claims.[1] First, they contend that the district judge improperly excluded from evidence a summary chart proffered by the defense. Second, they find error in the government's failure to produce, and the district court's failure to examine, notes taken by the prosecutor during interviews with various prosecution witnesses. Appellants argue that these notes must be produced under the Jencks Act. *See* 18 U.S.C. § 3500.

We find that the district judge acted well within her discretion in excluding the summary chart from evidence on the ground that it was "confusing." However, we remand this case because the district judge failed to meet her obligation to make an adequate determination that the prosecutor's notes are not in fact producible under the Jencks Act. Pending resolution of the Jencks Act issue, the appellants' convictions shall not be vacated.

## I. BACKGROUND

North American Reporting, Inc. (North American) is a corporation that provides stenographical services. Richard Lee Boyd is the president of North American. From

---

1. Appellants have also urged this court to find that the district court abused its discretion in refusing to allow certain questions during the cross-examinations of two prosecution witnesses, FBI Special Agent Coy and White House Press Office liaison Virginia Kim Hoggard. We decline to do so.

First, during agent Coy's testimony regarding the government's summary chart, appellants sought to ask him: "Prior to the preparation of the charts, did you discuss how you were going to present this information with the prosecutor in the case?" Tr. 618. The district judge disallowed the question, ruling that the appellants "aren't entitled to bring out the combination [sic] of talking to the district attorney. It doesn't have anything to do with [the relevant subject matter]. We assume that he talked to [the prosecutor]." Tr. 620.

The defense maintained that the question was necessary to show that the chart reflected "the government's point of view." *See* Tr. 618–19. However, we believe that it would be obvious to the jury that Coy was presenting the government's position in the case. After all, he was introduced as a government agent who had been involved in the investigation of North American, *see* Tr. 563–64, and the purpose of his testimony was to summarize the government's evidence. We therefore believe that the jury had sufficient information to appraise the bias and motives of the witness without the appellants' proposed cross-examination, and accordingly hold that the district court acted within its discretion in disallowing the line of inquiry. *See, e.g., United States v. DeLuca,* 692 F.2d 1277,

1282 (9th Cir.1982); *United States v. Hughes,* 658 F.2d 317, 321 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980).

Second, appellants sought to question Coy regarding the similarity between the times noted on North American's sign-in sheets, known as the "wall sheets," and the times represented by Boyd to the government in the vouchers. This line of questioning was designed to show how Boyd had not intentionally misrepresented time on his vouchers, but rather had relied on the wall sheets instead of the employees' time sheets. *See* Tr. 646. Agent Coy had not used these wall sheets in the preparation of the summary chart. Moreover, the wall sheets had not been authenticated by the employees who signed in, while the time sheets had been so authenticated. We therefore believe the district judge properly prevented this line of inquiry during the cross-examination of agent Coy. The defense remained free to introduce the wall sheets into evidence, provided the proper foundation could be established, and to bring out Boyd's reliance on the wall sheets when Boyd himself took the stand.

Third, appellants sought to question White House Press Office liaison Virginia Kim Hoggard about her refusal to meet with defense counsel prior to trial. *See* Tr. 275–76. Since this line of questioning was of such limited relevance, and since appellants were allowed to ask other questions regarding bias, *see* Tr. 274, we affirm the district judge's decision to disallow the question.

November 1, 1979 to October 31, 1981, North American provided court reporting services to the White House under two year-long contracts.

Under these contracts, North American was paid on the basis of the number of hours worked by its employees. The company submitted vouchers to the government every month listing the hours worked during the previous month, and breaking down the hours to show the time worked by each individual employee on each particular day. The government then paid North American in accordance with the hours represented on the vouchers.

North American's employees were also paid by the hour. Each employee would submit a time sheet to the company twice a month, and would receive compensation on the basis of the hours noted on the time sheet.

The prosecution alleged that Boyd, through the company, deliberately submitted false vouchers that overstated the hours worked by the company's employees. To prove the deliberate overbillings, the prosecution presented numerous former employees who authenticated their time sheets. A summary witness, Federal Bureau of Investigation (FBI) Special Agent Richard D. Coy, then presented a summary chart that compared the hours submitted by the employees on the time sheets and the hours submitted by Boyd on the vouchers. Coy testified that he had found 38.5% of the voucher entries he examined to be in excess of the hours represented on the employees' time sheets. He also identified 3.6% of the entries as *under* stating the number of hours represented on the time sheets. To aid Coy's summary testimony,

the prosecution entered into evidence a chart that listed the relevant entries from the vouchers and from the time sheets, and calculated the differences between the two for each particular employee.[2]

To counter the prosecution's case, the defense argued that "any discrepancies between the employee time sheets and the vouchers resulted from legitimate rounding off of hours, different contractual interpretations by the employees and North American Reporting as to what hours could be billed, and honest mistakes." Appellants' Brief at 7 (citations omitted). To support this theory, Boyd testified that, instead of referring to employees' time sheets to prepare the vouchers, he relied upon various sources, including his own memory, the President's schedule, typed transcripts, and employee sign-in sheets (so-called "wall sheets"), in order to reconstruct the time worked by his employees and himself.

To aid Boyd's testimony, the defense attempted to introduce into evidence a chart purporting to summarize, in the same manner as the prosecution's summary chart, numerous instances in which Boyd contends he *under* billed the hours actually worked in his vouchers submitted to the government. After objection by the prosecution, however, the district court excluded the chart on the grounds that it was "terribly confusing" and "absolutely baffling to the court [and] ... to the jury." Tr. 996, 998–99.

At the conclusion of a seven day trial, the jury convicted appellants on all counts. The district judge subsequently sentenced Boyd to concurrent sentences of two years' imprisonment on the odd-numbered counts and concurrent sentences of three years'

---

**2.** The prosecution also presented a courier, who testified that he had not performed some of the work for which Boyd had billed the government. *See* Tr. 502–06. Similarly, the prosecution presented a private accountant who testified that he had not performed three evenings of overtime for which Boyd had billed the government.

Moreover, the government put on testimony to show Boyd's guilty knowledge and intent. For example, one witness testified about a telephone conversation in which Boyd instructed

him to bill for an employee who was not working that day. According to this testimony, Boyd responded to resistance by saying, "Well, they won't remember at the end of the month anyway." Tr. 520–22. Other testimony indicated that Boyd had purposely billed under a government contract at a page rate higher than the contract rate on his assumption that "the person who was approving the invoice was not the same person who executed the contract and they'd probably never know." Tr. 530.

probation on the even-numbered counts provided that Boyd made restitution of $13,260. This appeal ensued.

## II. THE EXCLUSION OF DEFENDANTS' EXHIBIT NO. 24

■ During Richard Boyd's testimony, the defense attempted to introduce Defendants' Exhibit No. 24 into evidence. This exhibit purported to be a calendar of the defendants' *under* billings, and was designed to counter the prosecution's case as to deliberate overbillings by Boyd. Designed with a format similar to the government's summary chart, *see supra* at 51–52, the defendants' exhibit listed, day by day, the hours Boyd claimed to have underbilled the government.

However, unlike the prosecution's summary chart—which relied primarily upon the authenticated time sheets of employees—the defendants' exhibit relied upon a hodge-podge collection of personal memory, unauthorized evidence, surmise and *post hoc* contract interpretation. For example, seventeen entries on the defendant's exhibit relied entirely on Boyd's undocumented assertion that he was working on a given day, but did not bill for the time worked. Boyd testified that he assumed he worked on some of those days because he and Carol DeHaven, who married Boyd in September 1981, were "inseparable," and since Ms. DeHaven was working on those days, he "would have been there" also. Tr. 1009. In another entry, Boyd listed overtime for three employees because a fourth employee worked overtime that day, and Boyd "presumed [that the other three were] in also." Defendants' Exhibit No. 24, *reprinted in* Appellants' Appendix (A.A.) at 44 (March 10 entry). However,

the authenticated time sheet for at least one of those employees shows that the employee worked a normal eight hours that day. *See* Government Exhibit No. 34. Moreover, the voucher submitted by Boyd for that day shows a normal workday for *all* four employees. *See* Government Exhibit No. 6.

Moreover, a vast number of the entries in the defendants' chart rely upon a highly questionable interpretation of North American's White House contract. At trial, Boyd maintained that he would have been entitled to bill the government for overtime, in addition to the regular contract amount for a workday, whenever an employee began work before 10 a.m. or left work after 7 p.m., *regardless of whether the total hours worked by the employee exceeded the nine hour period specified in the contract.* While none of the government administrators who testified at trial supported this interpretation, and Boyd himself failed to submit vouchers that adhere to this interpretation, the defendants' chart employed this interpretation in order to create the preponderance of the supposed underbillings.[3]

■ For these, and additional,[4] reasons, we believe that the district judge had ample basis for excluding the defendants' chart on the ground that it was confusing. Evidence may be excluded, although it is relevant, if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. The decision to exclude relevant evidence pursuant to Rule 403 is committed to the sound discretion of the trial judge. *See, e.g., United States v. Lemire,* 720 F.2d 1327, 1348 (D.C. Cir.1983), *cert. denied,* —— U.S. ——, 104

---

3. By contrast, the relevant contract term provided that North American would perform services "during an 8-hour period *normally* between the hours of 10:00 AM and 7:00 PM, Monday through Sunday. *The 8-hour period may, upon sufficient notice (i.e., prior to release from duty the previous evening) fluctuate to any 8-hour block.*" Government Exhibit No. 1, at 22 (emphasis added); *see also* Government Exhibit No. 2, at 22 (statement of work).

4. For example, Boyd's "underbilling" for employees on one date relies on the wall sheet entries. However, the wall sheet for the relevant time period was not offered into evidence, and the employees implicated in the "underbilling" had not affirmed the wall sheet entry at trial. Accordingly, Boyd's "summary" chart in fact contained information not properly in evidence.

S.Ct. 2678, 81 L.Ed.2d 874 (1984); *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir.1973). Defendants' Exhibit No. 24 presents a frequently observed danger associated with summary charts: the jury might "treat the summary as additional evidence or as corroborative of the truth of the underlying testimony." *Lemire*, 720 F.2d at 1348; *see United States v. Scales*, 594 F.2d 558, 564 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). When, as here, the "evidence" summarized derives from such diverse sources, of various shades of unreliability, including mere surmise, undocumented recollection and questionable assumptions, we do not think the district judge abused her discretion in preventing the exhibit from influencing the jury.

Finally, we note that the district judge permitted Boyd to testify as to the matters presented by the chart. The defense therefore was not deprived of the opportunity to make its case regarding its underbilling theory.[5] By excluding the defendants' exhibit, the district judge simply assured that the jury would not be confused by the chart which, on its face, appeared to summarize "facts," but which, in actuality, collected the results of the jumble of the defendants' wishes, guesses and undocumented recollections. Accordingly, we find no error in the district judge's decision to exclude the chart from evidence.

## III. THE JENCKS ACT DETERMINATION

Before trial, the defense requested that the prosecution produce certain notes taken during interviews with witnesses. The defense maintained that the Jencks Act, 18 U.S.C. § 3500, required the production of such notes. Without examining the contents of the prosecutor's notes,[6] the district judge ruled that the notes were "work products" of the government attorneys, and were not producible under the Jencks Act. Tr. 24; *see* Tr. 25–30.

Appellants ask this court to rule that the prosecutor's notes were in fact producible under the Jencks Act. Further, appellants, citing 18 U.S.C. § 3500(d), contend that because Jencks Act materials were not produced, the testimony of the witnesses with whom the prosecutor conducted the relevant interviews, several of whom were key witnesses for the prosecution, should be stricken from the trial record. Accordingly, appellants conclude, this court should rule that the failure to produce the prosecutor's notes was reversible error.

While we find that the district judge failed to discharge her duty to inquire into whether the notes were producible under the Jencks Act, we decline at this stage of the proceedings to hold that this failure

---

**5.** Appellants also complain that the district judge abused her discretion by preventing Boyd from testifying about "the specific occasions when the 'undercharges' occurred" and "the dollar amount of the [total alleged] 'undercharges.'" Appellants' Brief at 21. We reject this contention.

It is often noted that a trial court enjoys broad discretion to reduce "undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *see Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In this case, the prolonged enumeration of the numerous instances in which Boyd claimed he had "undercharged" would have created such undue delay. Boyd's testimony regarding the actual dollar amount of the total alleged undercharges would have had no probative value as to whether his overbilling had been intentional. Since Boyd's testimony regarding the underbillings was offered only to prove his lack of guilty knowledge and intent, *see* Tr. 995–97, we believe that the judge did not

commit reversible error by preventing testimony regarding the total alleged undercharges. As the trial judge explained, "I don't really think it's material how much money he thinks he has undercharged them." Tr. 1014.

**6.** The appellants also requested production of notes taken by FBI agents during witness interviews. After examining these notes, the district judge ordered the production of five sets of notes taken under oath. *See* Tr. 27. These notes were evidently "adopted or approved" by the witnesses. *See* 18 U.S.C. § 3500(e)(1). As to the remaining sets of FBI notes, the district judge determined that they "sounded as though it was the reporter, not the person," *i.e.*, the witness, whose thoughts were reflected in the notes. *Id.* Thus, the district court made a reasonable determination that the remaining FBI notes were not "substantially verbatim." *See* 18 U.S.C. § 3500(e)(2).

constitutes reversible error. Instead, we remand this case for a redetermination of the Jencks Act issue. Pending such a redetermination, the appellants' convictions remain intact.

■ We note, to begin with, that the district judge ruled against the Jencks Act request on an erroneous legal ground. Without examining the prosecutor's notes, the district judge determined that they were "work products," and accordingly held that they were not producible under the Jencks Act. However, the Supreme Court has held unequivocally that the work product doctrine does not bar the production of the notes of government attorneys that are otherwise producible under the Jencks Act. *See Goldberg v. United States*, 425 U.S. 94, 105–08, 96 S.Ct. 1338, 1345–47, 47 L.Ed.2d 603 (1976).

■ Moreover, established precedent requires the district court to engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production. As the Supreme Court has explained:

> a Government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are statements producible under § 3500. In *Campbell I* [*Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961)] the

Court unanimously concluded that the trial judge was obliged to conduct some inquiry into the circumstances of the witness' interview there in question. The circumstances of this case compel the same conclusion. [The defendant's] testimony raised a sufficient question under the Act to require the trial judge to conduct such an inquiry, and since we hold that the trial judge erred in exempting the material from production as attorneys' "work product," a remand for such an inquiry by the District Court is required. . . .

*Goldberg*, 425 U.S. at 108–09, 96 S.Ct. at 1347 (citations and footnotes omitted). Furthermore, this court has held that a district judge "has an affirmative duty to determine whether any [Jencks Act] statement exists and is in the possession of the Government and, if so, to order the production of the statement." *Saunders v. United States*, 316 F.2d 346, 349 (D.C.Cir.1963); *see also Hilliard v. United States*, 317 F.2d 150 (D.C.Cir.1963). The district court's inquiry "may involve the interrogation of the witness or of the government agent, or an in camera examination of what is purported to be a statement under the statute." *Saunders*, 316 F.2d at 349. The district judge in this case entirely failed to make a reasonable inquiry into whether the prosecutor's notes should be produced under the Jencks Act.[7]

---

**7.** The government in its brief maintains that it was the defense's obligation to establish that the prosecutor's notes constitute Jencks Act "statements." *See* Appellee's Brief at 42–43. In so arguing, the government relies upon Justice Powell's concurrence in the *Goldberg* case.

In that concurrence, Justice Powell, joined by the Chief Justice, took issue with the majority's ruling that the trial judge was *required* to make further inquiry into the nature of the documents in issue. Instead, he found the witness' "cursory and ambiguous testimony" to be "wholly insufficient to require the judge to interrupt the trial and conduct a collateral inquiry." 425 U.S. at 120, 96 S.Ct. at 1352 (Powell, J., concurring). Building upon this concurrence, some circuits have now ruled that in order to give rise to a judicial responsibility to make an inquiry, the defendant must "first meet the burden of specifying with reasonable particularity (normally by his cross-examination at trial) that a certain

document exists, that there is a reason to believe that the document is a statutory 'statement,' and that the Government failed to provide it in violation of the [Jencks] Act." *United States v. Robinson*, 585 F.2d 274, 280–81 (7th Cir.1978) (en banc), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979); *see United States v. Gaston*, 608 F.2d 607, 611 (5th Cir.1979).

However, we choose not to follow these other circuits for two reasons. First, Justice Powell's concurrence runs counter to the principles espoused by the opinion of the Court in *Goldberg*, and agrees only in the result. Accordingly, to follow the principles expressed in the concurrence would defy the contrary pronouncements of the majority holding. Moreover, Justice Powell's concurrence also runs counter to the law of this circuit, as set forth in the *Saunders* opinion. Hence, our ruling today adheres to the law both of this circuit and of the Supreme Court.

Nor do we believe it is proper for this court to make the Jencks Act determination in this appeal. As a general rule, the initial determination of whether the documents constitute producible "statements" under the statute should be made in the district court. *See Goldberg*, 425 U.S. at 108, 96 S.Ct. at 1347 ("The Court of Appeals erred in undertaking to make the initial determination whether the materials constituted producible 'statements.' "); *id.* at 109 n. 15, 96 S.Ct. at 1347 n. 15 (examination of the documents "is initially a task for the District Judge"). Accordingly, we remand for the district court to make the Jencks Act determination.

In doing so, the district court should consider whether the prosecutor's notes qualify as "statements" under either section 3500(e)(1) or section 3500(e)(2) of title 18. If the notes qualify as "statements" under either subsection, they must be produced. Under section 3500(e)(1), the notes constitute the statements of witnesses if they have been "adopted or approved" by those witnesses. While prior to trial the prosecutor maintained her "very, very firm position that [the notes] ... have not been adopted by the witnesses," Tr. 24, the *Jencks* determination is to be made by the court, not the prosecutor. *See, e.g., Campbell v. United States*, 365 U.S. 85, 92–93, 81 S.Ct. 421, 425, 5 L.Ed.2d 428 (1961); *United States v. Harrison*, 524 F.2d 421, 428 (D.C.Cir.1975); *see also Palmero v.*

*United States*, 360 U.S. 343, 361, 79 S.Ct. 1217, 1229, 3 L.Ed.2d 1287 (1959) (Brennan, J., concurring). Thus the trial court must "determine whether the prosecutor's notes were actually read back to [the witness] and whether he adopted or approved them." *Goldberg*, 425 U.S. at 110, 96 S.Ct. at 1348. Under section 3500(e)(2), the notes constitute statutory "statements" if they are a "substantially verbatim" account of the witness interview. Notes that "evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes" do not meet this standard. On the other hand, this standard does not require that the notes reflect a "delusive exactness." *See Palmero v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959). So long as the notes can be fairly characterized as the witness' own words, they should be made available to the defense. *Id.* at 352, 79 S.Ct. at 1224.

We do not vacate the appellants' convictions pending resolution of the Jencks Act issue. If the district court, after adequate examination of the issues, determines that the notes do not constitute Jencks Act "statements," it should supplement the record with findings and enter a new final judgment of conviction. However, if the district court finds that any of the notes should have been produced pursuant to the Jencks Act, and that the error was not harmless,[8] the judgment of conviction

---

Finally, we note that even under Justice Powell's concurrence, this case should be remanded. Even though he believed that typically the trial judge has no affirmative duty to inquire into the documents in the absence of a reasonably particular showing of cause, Justice Powell concurred in the remand because the trial judge: did not deny the [Jencks Act] motion because of the insufficient foundational showing. Rather, he ruled that the "work product" privilege protected the prosecutor's notes. [The defendant's] counsel may not have sought to supplement his foundational showing because he had been led reasonably to believe that he had carried the burden of showing the necessity of an inquiry, and that the judge's denial was based solely on a mistaken view as to the "work product" privilege. For this reason, I concur in the judgment to remand. 425 U.S. at 129, 96 S.Ct. at 1356 (Powell, J., concurring). In the case before us today, the

district judge made precisely the same ruling, holding that the work product doctrine barred production of the prosecutor's notes. Accordingly, the appellants "may not have sought to supplement their foundational showing" because of the broad bar established by the trial judge's ruling. Thus, remand of this case would be proper even under the reasoning of Justice Powell's concurrence.

8. Courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial. *Clancy v. United States*, 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961). The harmless error doctrine must therefore be strictly applied in Jencks Act cases. *See, e.g., Goldberg*, 425 U.S. at 111 n. 21, 96 S.Ct. at 1348 n. 21; *Campbell v. United States*, 373 U.S. 487, 497 n. 14, 83 S.Ct. 1356, 1362 n. 14, 10 L.Ed.2d 501 (1963).

should be vacated and a new trial should be conducted. *See, e.g., Goldberg,* 425 U.S. at 111–12, 96 S.Ct. at 1348–49; *United States v. Del Toro Soto,* 676 F.2d 13, 17 (1st Cir.1982); *United States v. Peters,* 625 F.2d 366, 371 (10th Cir.1980); *United States v. Conroy,* 589 F.2d 1258, 1273 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

## IV. CONCLUSION

This case is remanded to the district court for a prompt redetermination of whether the prosecutor's notes should be produced pursuant to the Jencks Act. Finding no other errors upon appeal, we do not vacate the judgment of convictions pending the resolution of the Jencks Act issue.