United States Court of Appeals
 For the First Circuit
 

No. 97-2084

 UNITED STATES,
 Appellee,

 v.

 CRUZ ROSARIO-PERALTA,
 A/K/A CRESCENCIO CEDEO-PERALTA,
 Defendant, Appellant.

 

No. 97-2085

 UNITED STATES,
 Appellee,

 v.

 JOHNNY DAVID DIAZ-MORLA,
 Defendant, Appellant.

 

No. 97-2086

 UNITED STATES,
 Appellee,

 v.

 RAMON ANTONIO JAVIER,
 Defendant, Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Juan M. Prez-Gimnez, U.S. District Judge]

 Before

 Torruella, Chief Judge,

 Coffin, Senior Circuit Judge,

 and Selya, Circuit Judge.

 

Jorge A. Toro-McGowan for appellant Cruz Rosario-Peralta.
Benjamn Angueira-Aguirre for appellant Johnny Daz-Morla.
Zygmunt G. Slominski, by appointment of the Court, for
appellant Ramn Antonio Javier.
Michelle Morales, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, and Nelson Prez-Sosa,
Assistant United States Attorney, were on brief, for appellee.

 

 April 20, 1999
 TORRUELLA, Chief Judge. Defendants Cruz Rosario-Peralta,
Johnny David Daz-Morla, and Ramn Antonio Javier were apprehended
after aircraft and vessels from the United States Coast Guard,
Customs Service, Army National Guard, and Puerto Rico Police
Department pursued a suspect vessel for hours off the coast of
Puerto Rico. Defendants have asserted throughout that the
government units lost track of the original vessel and intercepted
their boat by mistake. Defendants were arrested, charged,
convicted, and sentenced for possession of the estimated $1 billion
worth of cocaine dumped into the ocean during the chase.
 Defendants raise numerous claims on appeal, including a
claim that the government violated their statutory and
constitutional rights to discovery by refusing to disclose logs
from two central communications agencies that monitored the
pursuit. Defendants allege that those logs are likely to contain
evidence of times and locations of the suspect vessel that make it
impossible for defendants' vessel to have been the vessel spotted
dumping the bales of cocaine. Because this argument is facially
appealing, and because we cannot test its merits on a deeper level
without delving into matters outside the record, we remand this
case to the district court to review the disputed logs and
determine whether they should have been disclosed and whether their
nondisclosure prejudiced the defendants. Although we remand for
these limited purposes, we retain jurisdiction over this appeal so
that we may consider defendants' other arguments (save for their
"sufficiency of the evidence" challenge, which we dispose of today)
if the district court's findings make it necessary to continue.
 BACKGROUND
 At approximately 1:11 a.m. on October 17, 1996, a United
States Customs Service aircraft referred to as OMAHA 13 detected a
vessel approximately twenty-two nautical miles off the coast of St.
Thomas, U.S.V.I., traveling westbound to Puerto Rico without any
lights. OMAHA 13, piloted by Pedro Rodrguez, tracked the vessel
for nearly two hours to a position approximately twenty nautical
miles off the coast of Puerto Rico, near the Fajardo lighthouse. 
Air Interdiction Officer James Sasser was also aboard OMAHA 13,
operating the radar and forward looking infrared ("FLIR")
surveillance and tracking system. Sasser testified at trial that
OMAHA 13 established a FLIR orbit of the suspect vessel at 2:13
a.m., meaning that it was orbiting the vessel at a radius of
approximately one and a half to two miles in order to keep it under
surveillance with the FLIR system. Sasser testified that OMAHA 13
continued FLIR orbits until the end of its role in the operation.
OMAHA 13 was running low on fuel, so, at approximately
2:30 a.m., it contacted a United States Army National Guard
helicopter ("HAWK 514") that was in the area and requested
assistance. HAWK 514, piloted by Captain Jos Roig, commander for
the Recognizance and Interdiction Detachment ("RAID"), arrived on
the scene ten to twelve minutes later. When HAWK 514 arrived on
the scene, Captain Roig established visual contact with both OMAHA
13 and the suspect vessel, using night vision goggles and HAWK
514's own FLIR system. Captain Roig communicated to OMAHA 13 a
description of the suspect vessel: an approximately 25-foot long
vessel with two outboard engines and three persons and several
bales on board. At approximately 2:50 a.m., OMAHA 13 directed HAWK
514 to illuminate the vessel with its "night sun," a 500-million
candle flood light. When HAWK 514 did so, the suspect vessel
accelerated and began unloading bales into the ocean. Captain Roig
testified that HAWK 514 remained over the suspect vessel and
continued to light the vessel until it was intercepted.
OMAHA 13 also contacted the United States Coast Guard for
assistance in intercepting the vessel, and the Coast Guard cutter
MONHEGAN was directed to proceed to the area at approximately 3:00
a.m. The crew of MONHEGAN quickly determined that, due to the wind
and sea conditions, it would not be able to get on the scene in
time to be of assistance. Nevertheless, a Customs vessel operated
by Special Agent Pedro Vicns and responding to OMAHA 13's request
for assistance arrived on the scene. At approximately 3:03 a.m.,
OMAHA 13 left the area to refuel and was replaced by another
Customs aircraft, OMAHA 85. The Customs vessel then approached the
suspect vessel from astern, and the Customs crew identified
themselves as police officers. The suspect vessel momentarily
stopped, but then accelerated again. The Customs vessel pursued
and rammed the suspect vessel from astern in an attempt to disable
the engines. Upon impact, defendants Rosario-Peralta and Javier
jumped from the suspect vessel into the water. The Customs vessel
stopped to retrieve the two individuals, while the suspect vessel
sped away. The Customs crew threw lines to Rosario-Peralta and 
Javier, but they swam away from the vessel. After fifteen to
twenty-five minutes of pursuit and discussion, the defendants
boarded the Customs vessel and were placed under arrest.
While the Customs crew did this, a Puerto Rico Police
Department FURA vessel that had arrived on the scene pursued the
suspect vessel. The FURA vessel identified itself as the police of
Puerto Rico and ordered the vessel to stop. While the vessel
initially refused, it finally stopped when Agent Pedro Crespo
threatened to neutralize its engines. Agent Crespo then boarded
the vessel and placed its operator, defendant Daz-Morla, under
arrest. Agent Crespo navigated the vessel to shore, and Special
Agent Vicns, who already had custody of Rosario-Peralta and 
Javier, took custody of Daz-Morla.
All three defendants were taken to the Roosevelt Roads
base for questioning, where they signed waivers of their
constitutional rights and made several statements. Rosario-Peralta
allegedly stated that they were fishing north of St. Thomas, but
did not know who the owner of the vessel was or how they obtained
the keys to the boat. Javier allegedly stated that they departed
from the Maternillo area in Fajardo, Puerto Rico to go fishing, but
that he did not know who the owner of the vessel was or how they
obtained the keys to the boat. Daz-Morla allegedly stated that
they departed the Maternillo area to go fishing around Culebra,
that he did not know how they obtained the keys or the vessel, and
that the light on the vessel burned out during the trip. A boat
certificate, a tax payment receipt, and a driver's license
belonging to the registered owner of the vessel were found in Daz-
Morla's possession.
At approximately 4:00 a.m., the crew of the Coast Guard
cutter MONHEGAN recovered 19 bales floating near the area where the
helicopter had witnessed the drop-off. A Puerto Rico Police
maritime unit recovered 12 more bales from the same area. Coast
Guard Petty Officer Christopher St. Martin field tested the
substance found inside one of the bales, and the substance tested
positive for cocaine. The 31 bales contained a total of 1,040
kilograms of a substance later found by a forensic chemist to be
cocaine. Later that morning, Agent Rafael Ocasio-Cruz of the
Canine Unit of the Puerto Rico Police Department placed Gator, a
canine specialized in detecting controlled substances, on the
vessel recovered from defendants. Gator directed Agent Ocasio-Cruz
to the front of the vessel and gave a positive sign for narcotics.
Defendants were charged with possession with intent to
distribute cocaine while on the high seas, in violation of 46
U.S.C. 1903(a)(b)(l) and (f), and aiding and abetting, in
violation of 18 U.S.C. 2. Defendants were indicted on these
charges on October 23, 1996, and entered pleas of not guilty. 
Following an eleven-day jury trial, guilty verdicts were returned
against all three defendants. On September 7, 1997, the district
court imposed the maximum sentences allowed by the recommended
guidelines: (1) 327 months of imprisonment for defendant Rosario-
Peralta; and (2) 293 months of imprisonment for defendants Javier
and Daz-Morla. On September 15, 1997, defendants filed timely
notices of appeal, challenging their convictions and sentences.
 DISCUSSION
Defendants raise numerous arguments on appeal. They
claim: (1) that the district court's refusal to compel discovery of
certain materials denied defendants their statutory and
constitutional rights to discovery, due process, confrontation of
witnesses, and cross-examination; (2) that the district court
engaged in advocacy by interfering with the defense expert's
testimony; (3) that the district court erred in allowing
prejudicial testimony of a positive canine alert for narcotics;
(4) that the district court erred in refusing to allow defense
counsel to voir dire the canine handler outside the presence of the
jury; (5) that the district court erred in allowing defendants'
statements to be used against them at trial; (6) that the
government failed to prove beyond a reasonable doubt that
defendants possessed the bales of cocaine in question; (7) that the
district court erred in allowing prejudicial testimony that the
street value of the cocaine seized was one billion dollars;
(8) that the district court communicated to the jury that it had
already convicted defendants by issuing a gag order stating that
defendants were "caught" near Fajardo; (9) that the district court
erred in refusing to give an instruction on defendants' theory of
the case; and (10) that the sentences of incarceration imposed by
the court were excessive and contrary to the intent of the
sentencing guidelines. Because we find that the district court
could not have properly denied the discovery -- on relevancy
grounds -- of one of the sets of materials requested by defendants
without reviewing those materials, we do not reach defendants'
other contentions at this time, save one. Rather, we retain
jurisdiction over the appeal, but remand this case to the district
court with instructions to review the requested materials,
determine whether they should have been disclosed, and, if so,
determine whether defendants were prejudiced by the nondisclosure.
Notwithstanding our focus on the discovery issue and our
postponement of decisions on defendants' other claims, we do
consider defendants' claim that the evidence was insufficient to
demonstrate their guilt beyond a reasonable doubt. A resolution of
this claim in defendants' favor would obviate the need for any
further proceedings and would moot the discovery issue. Defendants
argue that the government failed to prove beyond a reasonable doubt
that their vessel was the vessel spotted throwing bales of cocaine
into the water. Viewing the evidence, as we must, in the light
most favorable to the verdict, see United States v. Noah, 130 F.3d
490, 493 (1st Cir. 1997), we cannot accept the defendants'
argument. The evidence in this case was clearly sufficient to
support the defendants' convictions. The officers involved in the
pursuit testified that they saw the bales being thrown from the
suspect vessel and that they followed the suspect vessel until it
was intercepted. Defendants' attacks on this testimony are mainly
credibility arguments that are ill-suited to the standard of review
in this type of claim. The jury heard testimony linking
defendants' vessel to the bales of cocaine, and defendants have not
adequately demonstrated that this testimony was false or
inaccurate. Thus, the record amply supports a finding that
defendants possessed the cocaine in question beyond a reasonable
doubt. 
The claim we focus on is defendants' allegation that the
district court abused its discretion in failing to compel the
government to produce the communication records and logs of two
land-based central communications agencies, codenamed "Salty Dog"
and "Razorback." Defendants argue that those central
communications agencies maintained constant surveillance of the
operation and were involved in the direction, tracking, and
coordination of the government assets assigned to the operation. 
Several times prior to and during trial, defendants requested the
records and logs of those agencies in order to attempt to cast
doubt upon the testimony of the government witnesses regarding the
locations of the units and vessels involved. Defendants argue that
the district court erred in failing to require these records and
logs to be produced. A. The Government's Discovery Obligations
Defendants cite three sources for the government's
obligation to disclose the records and logs: (1) Fed. R. Crim. P.
16(a)(1)(C); (2) Brady v. Maryland, 373 U.S. 83 (1963); and (3) the
Jencks Act, 18 U.S.C. 3500. Rule 16(a)(1)(C) of the Federal
Rules of Criminal Procedure provides, in relevant part:
Upon the request of the defendant the
government shall permit the defendant to
inspect and copy or photograph books, papers,
documents, photographs, tangible objects,
buildings or places, or copies or portions
thereof, which are within the possession,
custody or control of the government, and
which are material to the preparation of the
defendant's defense or are intended for use by
the government as evidence in chief at the
trial, or were obtained from or belong to the
defendant.

Fed. R. Crim. P. 16(a)(1)(C) (emphasis supplied). Because the
records and logs in question were not used or intended for use by
the government, they were only required to be disclosed under Rule
16(a)(1)(C) if they were "material to the preparation of the
defendant[s'] defense." Additionally, in order to succeed on a
claimed violation of Rule 16, a defendant must demonstrate that he
has been prejudiced. See United States v. Spinosa, 982 F.2d 620,
631 (1st Cir. 1992); United States v. Hemmer, 729 F.2d 10, 13 (1st
Cir.), cert. denied, 467 U.S. 1218 (1984).
Under Brady, exculpatory evidence is discoverable by the
defendant where it "is material to guilt or punishment." Brady,
373 U.S. at 87. In order to succeed on a Brady claim, "a defendant
must show that the withheld 'evidence was exculpatory, as measured
by its materiality.'" United States v. Watson, 76 F.3d 4, 7 (1st
Cir.) (quoting Hemmer, 729 F.2d at 14), cert. denied, 517 U.S. 1239
(1996). Information is "material" "if there is a reasonable
probability that, had the evidence been disclosed to the defense,
the result of the proceeding would have been different." SeeUnited States v. Blais, 98 F.3d 647, 651 (1st Cir. 1996) (quoting
United States v. Bagley, 473 U.S. 667 (1985)), cert. denied, 519
U.S. 1134 (1997). A "reasonable probability" is a probability
sufficient to undermine confidence in the outcome. See Bagley, 473
U.S. at 682.
 The Jencks Act requires the government to provide, upon
request, any prior statements of government witnesses that relate
to the subject matter of the witnesses' testimony. See 18 U.S.C.
3500(b). A Jencks Act "statement" is: (1) a written statement
made, adopted, or approved by the witness; (2) a recording (or
transcription thereof) that is a substantially verbatim recital of
an oral statement made by the witness and recorded
contemporaneously with the making of the oral statement; or (3) a
statement (or transcription thereof) made by the witness to a grand
jury. See 18 U.S.C. 3500(e). The government is required to
produce those statements whether they are exculpatory or not. SeeUnited States v. Stern, 13 F.3d 489, 494 (1st Cir. 1994). In order
to succeed on a claimed violation of the Jencks Act, defendants
must demonstrate that they have been prejudiced by the failure to
disclose. See United States v. Izzi, 613 F.2d 1205, 1213 (1st
Cir.) (citing United States v. McGovern, 499 F.2d 1140, 1143 (1st
Cir. 1974)), cert. denied, 446 U.S. 940 (1980).
 B. Nondisclosure of the Central Communications Agency 
 Records and Logs

 A review of the procedural history of this claim
demonstrates that it is unclear exactly what grounds the district
court relied on in denying this discovery request, although it
appears to have found that the records and logs were irrelevant. 
On February 7, 1997, defendants filed a motion to compel the
disclosure of, inter alia, the identities of all of the central
communications agencies used in the operation and their internal
logs, records, and communication tapes. At the February 10, 1997
Status Conference, the district court delayed ruling on defendants'
request for these materials because the court wanted to "see what
the government provides to [defendants]" before ruling on the
motion to compel. The court then scheduled a status conference for
two weeks later.
 On February 20, 1997, the government filed a response to
defendants' motion to compel, claiming that the records and tapes
of the central communications agencies were not subject to
disclosure on the grounds of confidentiality. The government
argued that its burden to demonstrate the need for confidentiality
had not yet been triggered because defendants had not yet
demonstrated the need for the records and tapes.
 At the February 24, 1997 Status Conference, defendants
argued that the units pursuing the vessel lost sight of it and
consciously avoided communicating that information on the channels
that were being recorded. Defendants argued that the central
communication records and tapes contained evidence that the
pursuers lost sight of the vessel. Without addressing the asserted
need for confidentiality, the district court found that defendants
had not demonstrated that the records and tapes were necessary and
denied the motion.
 On May 1, 1997, defendants raised the issue again in
their Joint Motion to Compel Additional Discovery and/or For
Reconsideration of Motion to Compel Discovery. Defendants argued
that they needed all government communications surrounding the
tracking and interception of the vessel in question. Defendants
attacked the government's confidentiality rationale for withholding
the records, claiming that the government's surveillance techniques
and the location of the central communications agencies had already
been compromised by the disclosure of the FLIR videotapes,
recordings, and other documents. Defendants argued that they could
not assess the materiality of the records and tapes without an
opportunity to review them and suggested that any remaining
confidentiality concerns could be preserved by disclosing the
records and tapes to the defendants under seal.
 On May 8, 1997, the government filed a response to
defendants' motion. In that response, the government argued that
no such recordings of the surveillance operation existed and that
the central communications logs contained classified information
and were irrelevant. The government also noted that defendants had
already been provided with the surveillance videotapes, which
recorded communications between the government assets involved in
the tracking and apprehension of the vessel, as well as the reports
of all of those government assets. The docket does not reflect a
resolution of defendants' May 1, 1997 joint motion by the district
court, even though defendants moved for a final status conference
or pre-trial conference to address the issues.
On May 14, 1997, the third day of trial, defendants again
moved to compel the records and logs of "Salty Dog" and
"Razorback." Defendants claimed that Pedro Rodrguez, the pilot of
OMAHA 13, testified that he was required to make position reports
to "Salty Dog" every thirty minutes and that he maintained
communications with his home base, "Razorback." Defendants again
claimed that they were entitled to inspect and review the records
of "Salty Dog" and "Razorback" in order to determine whether they
contained any relevant information. The district court immediately
denied this motion "for the same reasons that [it] denied it
before." The issue did not arise again until defendants appealed.
 C. Abuse of Discretion
We review the district court's determinations under
Brady, the Jencks Act, and Rule 16 for abuse of discretion. SeeUnited States v. Brimage, 115 F.3d 73, 78 (1st Cir.), cert. denied,
118 S. Ct. 321 (1997); Spinosa, 982 F.2d at 630-31. Based on the
information currently in the record, we find that the district
court abused its discretion in finding that the records and logs
were irrelevant without first reviewing them.
Defendants' theory throughout has been that their boat
could not have traveled the distance between the point where the
bales were dumped and the point of defendants' interception in the
time illustrated by the FLIR videotapes. Defendants argue that the
locations of the vessels and aircraft at various points in time,
coupled with the maximum speed of their boat under the reported
conditions, make it impossible for their boat to have been the
vessel that was spotted dumping the bales of cocaine. Thus, the
exact position of the suspect vessel at various junctures was
critical to defendants' theory and was a disputed issue at trial. 
Defendants argue that the logs contain the time and position of
every unit in the area during the pursuit of the suspect vessel,
including that of HAWK 514, the National Guard helicopter that was
allegedly over the top of the suspect vessel the entire time. If
the logs in fact contain such information, we do not see how they
could fail to be relevant.
The government agrees that the logs contain reports of
the positions of the aircraft, but argues that defendants already
had this information. In doing so, the government does not argue
that the information in the logs is irrelevant, only that the
defendants already possessed this information in other forms. The
government cites no authority for the proposition that it may deny
discovery of relevant evidence on the ground that defendants
already have enough evidence on that issue. Even if the
government were able to unilaterally deny discovery on this ground,
neither we nor the district court would know for certain that
defendants already possessed every relevant item of information
contained in the logs. We can only pass upon such an issue after
viewing those records. Defendants claim that the FLIR tape
includes instances where the government agents were specifically
instructed to go "off the record" so that the communications would
not be recorded on the FLIR tape. Those "off the record"
communications may well be included in the logs of the central
communications agencies. Additionally, there is the possibility
that the locations contemporaneously recorded in the logs will
differ from the testimony of the pilots of the vessels or the
reports filed after the incident. Defendants already contend that
the positions recorded in the FLIR tapes and marked in the reports
do not match up with the testimony of Captain Roig or Special Agent
Vicns, and the logs could well provide evidence of other such
discrepancies. In light of defendants' theory of the case, and in
light of the fact that the government does not dispute that the
logs contain the seemingly relevant times and locations of the
units in the area, we find that the district court abused its
discretion in finding the logs to be irrelevant without first
reviewing them.
In addition to their relevancy arguments, defendants
claim: (1) that the logs constitute "statements" required to be
produced under the Jencks Act, and (2) that the logs are
exculpatory Brady material because they could have been used as
substantive evidence of aircraft locations and as impeachment
material for the cross-examination of government witnesses
regarding those locations. The district court apparently denied
this discovery because it found that the logs were not relevant. 
It thus did not reach these more specific questions. Therefore, we
have no determinations to review in considering defendants' Bradyand Jencks Act arguments.
To answer all of these concerns, the government has
submitted a copy of what it proffers to be the only relevant log
for our review. At oral argument, government counsel was asked
whether the relevant logs or records were in the possession of the
government. The Court requested that government counsel obtain and
preserve the logs in the event that the Court found a need for
them. After oral argument, the government submitted to the Court
a three-page copy of the October 17, 1996 morning log of the United
States Command Center Sector for United States Customs ("Sector").
It is not appropriate for us to consider this submission. 
It is elementary that evidence cannot be submitted for the first
time on appeal. The district court made no rulings based upon a
review of the Sector log; in fact, the district court has not seen
it. The log was not part of the district court record, and
therefore should not be part of our analysis. Any determinations
that we would make regarding the relevancy of the log, its
exculpatory nature, or its characterization as a "statement" under
the Jencks Act would be the first such determinations in this case. 
This is not our role. See Goldberg v. United States, 425 U.S. 94,
108 (1976) (holding that the Court of Appeals erred in making the
initial determination of whether certain materials constituted
"statements" producible under the Jencks Act and expressing doubt
that this function may ever be properly undertaken by a court of
appeals); United States v. North American Reporting, Inc., 740 F.2d
50, 56 (D.C. Cir. 1984) (citing Goldberg for the general rule that
the initial determination of whether documents are producible
"statements" under the Jencks Act should be made in the district
court); United States v. Sorrentino, 726 F.2d 876, 888 (1st Cir.
1984) (declining to examine a report to determine which portions
were producible when the district court had not first done so and
remanding to the district court with instructions to examine the
report, determine which portions were producible, and determine
whether the failure to produce those portions materially prejudiced
the defense).
Accordingly, we retain jurisdiction over this appeal, but
decline to rule on any of defendants' other arguments until the
district court has reviewed the Sector log and any other similar
logs and has determined whether they were material to the
preparation of the defendants' defense and were therefore required
to be disclosed under Rule 16(a)(1)(C). If the district court
determines that the logs were not discoverable under Rule
16(a)(1)(C), it shall determine whether the logs were required to
be disclosed as Brady material or as Jencks Act "statements." If
the district court determines that any of the logs should have been
produced under Rule 16, Brady, or the Jencks Act, it shall hold a
hearing to determine whether the government's failure to turn over
that log materially prejudiced the defense. If the district court
finds that the nondisclosure materially prejudiced the defense, a
new trial must be granted. However, if, after reviewing the logs,
the district court finds either that they were not discoverable or
that defendants were not prejudiced by their nondisclosure, we will
review those determinations for abuse of discretion and then resume
our consideration of defendants' remaining contentions on appeal.
 CONCLUSION
Based on the foregoing, we retain jurisdiction over the 
present appeal and remand to the district court for the limited
purposes outlined above. The district court is granted 90 days
from the date of this opinion to make the appropriate
determinations. It shall do so by making written findings, and
shall transmit a copy thereof to the Clerk of the court. When the
district court has made its determinations, counsel for both
parties shall notify the Court, at which time, if necessary, we
will decide the remaining issues raised by defendants' appeal.