# United States Court of Appeals
## For the First Circuit

No. 99-1904

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL M. O'CONNELL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Chief Judge,

Boudin and Lynch, Circuit Judges.

Lois M. Farmer, with whom Garnick & Scudder, P.C., was on brief, for appellant.
Joshua S. Levy, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

June 12, 2001

**TORRUELLA, <u>Chief Judge</u>.** Appellant Michael M. O'Connell appeals the sentence imposed pursuant to his plea of guilty for five counts of making, possessing, and uttering counterfeit and forged securities in violation of 18 U.S.C. § 513(a). Specifically, he alleges that he was denied his right to allocution during the sentencing hearing, that the district court erred in applying a two-point enhancement for abuse of trust, and that the district court abused its discretion in sentencing him at the high end of the Guideline range. We reject each of these claims and affirm the sentence imposed by the district court.

### <u>BACKGROUND</u>

Michael M. O'Connell worked as an office manager and bookkeeper for Pyramid Textiles (Pyramid), an international fabric wholesale company located in Billerica, Massachusetts. O'Connell was hired by Pyramid in 1993, because the owners, John and Deborah Leavitt, were close family friends. John Leavitt, also the president of Pyramid, traveled extensively on business, and delegated much of the responsibility for the financial operations to O'Connell. While O'Connell did not have the authority to sign Pyramid checks, he would prepare them for Leavitt's signature. In addition, O'Connell was authorized to transfer funds from an $850,000 line of credit to Pyramid's checking account.

On January 21, 1998, Leavitt held a meeting with a Fleet Bank representative about increasing Pyramid's line of credit to $2 million. The Fleet representative informed Leavitt that the checking account was overdrawn by $140,000 and the entire $850,000 line of credit was exhausted. Shocked, Leavitt confronted O'Connell, who ultimately admitted that he had been stealing from Pyramid since 1995 in order to finance his gambling addiction. Through a scheme of making out Pyramid checks to himself, and forging Leavitt's signature, O'Connell had stolen $723,107.97 from Pyramid in the three-year period.

After an information was filed against O'Connell charging him with five counts of making, possessing, and uttering forged and counterfeit securities in violation of 18 U.S.C. § 513(a), he negotiated a plea agreement with the government. Pursuant to that agreement, O'Connell elected to waive indictment and to plead guilty to the five counts. The government recommended a sentence of twenty-one months, which fell in the middle of the Guideline range of eighteen to twenty-four months of the agreed-upon offense level of 15. At a hearing on March 25, 1999, the district court accepted O'Connell's guilty plea, ordered a presentence report to be prepared, and set sentencing for June 22, 1999.

At the disposition hearing on June 22, the district court informed O'Connell and the government that he had read the presentence report and concluded that an additional two levels should be added to

the offense level calculation for abuse of a position of trust. U.S.S.G. Manual § 3B1.3 (2000). The district court also noted that he was considering an upward departure based on a letter from Deborah Leavitt detailing the additional harm that O'Connell's actions had caused. For one, the Leavitts had to pay interest and penalties for late payment of real estate taxes -- as O'Connell had delayed the forwarding of these tax payments at various times. The Leavitts were also in the process of trying to restore their line of credit and had undergone several audits of their finances. Finally, the Leavitts were at a risk of losing the business, which would result in fourteen employees losing their jobs. From this, the district court suspected that the actual monetary loss was much greater than the $723,000-plus that had been counted for purposes of sentencing. The district court rescheduled sentencing and offered both sides the opportunity to respond to both the abuse-of-trust increase and the upward departure.

The rescheduled sentencing hearing was held on July 28, 1999. The government, pursuant to the plea agreement, declined to take a position on the abuse-of-trust increase or the upward departure. O'Connell's counsel argued against the abuse-of-trust enhancement, stating that O'Connell did not fall within the Guideline definition of position of trust, because (1) he was not authorized to sign Pyramid checks in either his or John Leavitt's name; and (2) his actions were overseen by an accountant. As such, O'Connell's counsel characterized

-4-

his status as comparable to that of a bank teller, in having access to sensitive documents but not the authority to take the actions (forging Leavitt's signature) that O'Connell did. The district court rejected this argument and applied the two-point adjustment. This put O'Connell at an offense level of 17, which provides for a range of twenty-four to thirty months imprisonment.

Turning to the upward departure, the district court informed the parties that further communication with the Leavitts had revealed that they were not interested in pursuing additional punishment of O'Connell. Based on that, on the possibility that other factors may have contributed to Pyramid's demise, and on the fact that O'Connell's actions were precipitated by his gambling addiction, the district court decided not to make an upward departure from the Guidelines.

Then the government and counsel for O'Connell offered their views on an appropriate sentence, both advocating a sentence at the bottom of the range. In conclusion, O'Connell's stated: "Mr. O'Connell would like to address the Court." The district court replied: "Mr. O'Connell, I will hear from you, please." O'Connell accepted responsibility for his actions, apologized to his family and to Mr. Leavitt, pledged to repay the money that he took, and thanked his attorneys. He also thanked the court for giving them (he and his attorneys) the opportunity "to address the issues that we felt that we wanted to address." The court thanked O'Connell and sentenced him to

thirty months imprisonment, the highest sentence under the Guidelines. The district court commented that the sentence reflected an "intuitive feeling" that more than $723,000 had been lost as a result of O'Connell's actions.

**DISCUSSION**

O'Connell appeals his sentence on three bases: (1) the district court denied him his right of allocution prior to sentencing; (2) the district court committed legal error in applying the two-point abuse-of-trust enhancement; and (3) the district court considered improper factors in sentencing at the high end of the Guideline range.

## A. Right of Allocution

The right of allocution, while "ancient in law," United States v. De Alba Pagán, 33 F.3d 125, 129 (1st Cir. 1994), is currently articulated in Federal Rule of Criminal Procedure 32(c)(3)(C), which states that before imposing sentence, the court must "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." Rule 32(c)(3)(C) has not been found to require that any specific language be used by the district court, Green v. United States, 365 U.S. 301, 303-04 (1961), provided that "the court, the prosecutor, and the defendant must at the very least interact in a manner that shows clearly and convincingly that the defendant knew he

-6-

had a right to speak on any subject of his choosing prior to the imposition of sentence."  De Alba Pagán, 33 F.3d at 129.

Although we have cautioned that "functional equivalency should not lightly be assumed," id., we hold that O'Connell did exercise his right of allocution at the time of his sentencing.  After O'Connell's counsel expressed his views on an appropriate sentence,  he announced that: "Mr. O'Connell would like to address the Court."  The court replied, "Mr. O'Connell, I will hear from you, please." O'Connell made his apologies, pledged to reform himself and repay the Leavitts, and thanked his attorneys and the district court for assisting him and giving him the opportunity to "address the issues that we felt that we wanted to address."

This sequence of events, as we read it in the transcript, implies a full awareness on the part of O'Connell of his right to allocution.  The fact that the district court did not specifically invite O'Connell to speak on any subject of his choice is irrelevant in this instance, particularly since it appears that O'Connell's counsel seized the opportunity before the district court had the chance to address O'Connell unprompted.  We hold that the record demonstrates "clearly and convincingly," id., that O'Connell knew of his right to speak prior to the imposition of his sentence and that he took advantage of that opportunity by communicating those things that he

found important to say.  Accordingly, the district court committed no error in this regard.

## B.  Abuse-of-Trust Adjustment

The district court increased O'Connell's offense level by two levels pursuant to § 3B1.3 of the Sentencing Guidelines: "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  U.S.S.G. Manual § 3B1.3.  O'Connell argues that the district court committed legal error in concluding that he occupied a "position of trust."  Our review of the legal question, that is, what qualifies as a position of trust under the Guidelines, is de novo.  United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998).

The Guideline Commentary defines a "position of public or private trust" as "characterized by professional or managerial discretion."  U.S.S.G. Manual § 3B1.3, cmt. n.1.  Under this definition, a bank executive would qualify, but a bank teller would not.  Id.  In light of this "special meaning," we have held that a receptionist/switchboard operator at police headquarters, although entrusted with sensitive information, did not hold a position of trust, because the job afforded "no discernible discretion."  Reccko, 151 F.3d at 31-33.

There is some support for O'Connell's argument that his position as a bookkeeper at Pyramid did not place him within the Guideline definition of a position of trust. He was not a legal signatory on the Pyramid checking account, and clearly exceeded the bounds of his authority when he forged John Leavitt's name to the checks that he made out to himself. Further, an outside accountant was responsible for overseeing much of O'Connell's work at Pyramid. Both of these factors suggest that it was not professional discretion that facilitated the commission of O'Connell's crimes, but merely his access to the Pyramid checkbook and accounting software. The Commentary and our caselaw emphasize that this would not qualify for a § 3B1.3 increase.

The district court, however, pointed to two other aspects of O'Connell's employment that enabled his thefts: O'Connell's authority to transfer funds from the line of credit to the checking account and his close, personal relationship with the Leavitts. There is no question that O'Connell's unfettered access to an $850,000 line of credit facilitated his taking as much money undetected as he did. And the authority to draw off the account suggests significant managerial discretion.[1] The district court also believed that O'Connell's personal relationship led John Leavitt to put more trust in O'Connell than he

---

[1] That O'Connell was afforded managerial discretion is unsurprising given his role at Pyramid as "office manager."

would have in a stranger, resulting in less supervision of and more autonomy for O'Connell. This is consistent with the uncontested finding of the presentence report that John Leavitt increasingly relied on O'Connell to manage Pyramid's financial affairs. The district court surmised that O'Connell's treatment by the Leavitts as "basically" that of a son enabled his criminal efforts. We review the district court's factual determinations for clear error, United States v. Tardiff, 969 F.2d 1283, 1289 (1st Cir. 1992), and discern none with reference to these findings.

Because O'Connell had the authority to access the line-of-credit account and because we uphold the district court's conclusion that O'Connell's relationship with the Leavitts rendered him uniquely trusted as an employee, we hold O'Connell did occupy a position of trust for purposes of the Sentencing Guidelines. As to the second step of the inquiry, whether O'Connell used his position of trust to facilitate commission of the criminal acts, see United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996), we agree with the district court that O'Connell's access to the line of credit and professional/personal relationship with the Leavitts did in fact improve his chance of success and contributed to the long period of time during which he was able to conceal the thefts. The two-level increase under § 3B1.3 to O'Connell's offense level is affirmed.

## C. O'Connell's Thirty-Month Sentence

O'Connell appeals the district court's decision to sentence him at the high end of the twenty-four to thirty-month Guideline range, alleging that the district court's sentencing decision was imposed in violation of the law.  The district court commented that one of the reasons for the high sentence was a continued belief that more than $723,000 was lost as a result of O'Connell's actions.  O'Connell accuses the district court of "offend[ing] fundamental fairness" in violation of due process in relying on "intuition" that much more monetary damage had occurred than was reflected in the sentencing figure.

According to 18 U.S.C. § 3553(c), a district court does not have to provide any reason for a particular sentence, provided that the sentence falls within the Guidelines range and the range does not span more than twenty-four months.  This is the case here, as the district court did not depart from the Guidelines and the sentencing range was only six months.  Even more importantly, we have repeatedly held that when a district court sentences within the appropriate Guideline range, we have no authority to review that sentence.  United States v. Rosario-Peralta, 199 F.3d 552, 569 (1st Cir. 1999); United States v. Rodríguez, 162 F.3d 135, 151 (1st Cir. 1998); United States v. Panet-

<u>Collazo</u>, 960 F.2d 256, 261 (1st Cir. 1992). We conclude, then, that there is no appellate jurisdiction as to this issue.[2]

## **CONCLUSION**

O'Connell was not denied his right of allocution. The district court properly determined O'Connell's Guideline offense level and sentenced him within that sentencing range. The sentencing decision of the district court is **affirmed**.

---

[2] We have not addressed the question, presented in <u>United States</u> v. <u>McDavid</u>, 41 F.3d 841 (2d Cir. 1994), of whether we have jurisdiction to review a sentence that is within the applicable Guidelines range but that is based on a material misstatement of fact. We do not think this case fairly presents that situation, making consideration of the issue inappropriate and unnecessary.