Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 9, 2004      Decided March 19, 2004

No. 03-3104

UNITED STATES OF AMERICA,
APPELLEE

v.

DAVID CHRISTIAN STANFIELD,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00239–01)

———

*Cheryl D. Stein*, appointed by the court, argued the cause and filed the briefs for appellant.

*Arthur B. Spitzer* was on the brief for *amicus curiae* American Civil Liberties Union of the National Capital Area in support of appellant.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher*, *Roy W. McLeese III*, and *Jay I. Bratt*, Assistant U.S. Attorneys. *Suzanne G. Curt*, Assistant U.S. Attorney, entered an appearance.

Before: EDWARDS, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: David Christian Stanfield appeals from the district court's revocation of his probation and imposition of a special condition of supervised release limiting his use of the internet. He argues that the probation revocation hearing was tainted by vindictiveness on the part of the district court and by several procedural violations, including a ruling that certain documents were not producible to the defense under Federal Rule of Criminal Procedure 26.2, a failure to provide adequate time for defense counsel to review the documents that were produced at the hearing, and a time limitation on the cross-examination of a government witness. Stanfield further contends that the internet restriction is so broad and vague that it contravenes both the First Amendment and relevant statutory guidelines. We find that most of these claims lack merit, but remand to the district court for clarification of the internet restriction and a more considered determination of whether the documents held not to be producible should in fact have been produced.

## I.

Stanfield was sentenced to five years probation in December 2002, following a plea of guilty to charges of identity theft, conspiracy to distribute methamphetamine, and transferral of a false identification document in furtherance of a drug trafficking crime. The district court imposed a set of standard conditions of probation, including requirements that Stanfield work regularly and notify his probation officer at least ten days prior to any change in employment status. In addition to the standard conditions, the court imposed a

number of special conditions: Stanfield was required to participate in a mental health evaluation and obtain mental health treatment, required to submit to periodic drug testing, prohibited from working at a job affording access to customer information such as social security numbers and birth dates, and barred from using the internet "in any way, shape, or form until further order of the Court." The latter two conditions were a response to Stanfield's history of identity theft, although it was conceded that he had not used the internet in the commission of those crimes.

In imposing the five-year probation term, the district court departed downward from the sentence that Stanfield faced under the Sentencing Guidelines — a prison term of fifty-seven to seventy-one months. The significant downward departure was an acknowledgment of Stanfield's substantial assistance in the investigation of the drug conspiracy in which he had been involved. At the sentencing hearing, however, the court warned Stanfield that it would carefully monitor his compliance with the terms of his probation: "[A]ny problems at all and I will hold you accountable, and if I find that you are at fault, I will revoke your probation and impose a period of incarceration. You are so warned." Sentencing Hr'g (Dec. 17, 2002), *quoted in* Violation Sentencing Hr'g Tr. (Aug. 25, 2003), at 13 (Sentencing Tr.).

In April 2003, the district court became aware that Stanfield had apparently been using the internet in violation of the conditions of his probation — specifically by posting on a website poetry and e-mail addresses through which he could be reached. *See* Letter from Edward Shaw, U.S. Probation Officer, to Stanfield (Apr. 14, 2003). The court alerted the probation office, which wrote Stanfield that "the court directs you to remove the website and to cancel the e-mail addresses." *Id.* On April 23, Stanfield filed a motion for clarification of the internet restriction; two days later, the district court ordered that a previously scheduled probation progress hearing be converted to a hearing on violation and asked the probation office to prepare a violation report.

In the probation office's report and at the hearing, held on May 15, 2003, evidence emerged that Stanfield's compliance with the terms of his probation had been mixed. With respect to the employment condition, the record showed that he had worked for only one full day since the December 2002 sentencing. Apparently chafing at the limited range of jobs available to him under the terms of his probation, he had told both his probation officer and a mental health counselor that he refused to take a job "flipping burgers." *See* Tr. of Hr'g on Violation (May 15, 2003), at 25, 61 (HOV Tr.); Mem. from Sharon Davis, Frayser Family Counseling Center, to Shaw (Apr. 28, 2003), at 2 (Davis Memo).[1] Probation Officer Edward Shaw later testified that Stanfield had applied to only a few of the approximately twenty employment agencies in the Memphis, Tennessee area where Stanfield had been permitted to serve his probation. *See* HOV Tr. at 25, 61–62. Shaw also testified that Stanfield had violated one of the conditions of his probation by failing to tell Shaw in advance about a one-day temporary job that he took in February 2003. *Id.* at 24. The evidence on Stanfield's efforts to gain employment was not entirely negative, however: a number of faxes and logs showed that he had been searching for work, *see id.* at 63–65, and Shaw testified that on two occasions Stanfield received offers for substitute teaching jobs that were later revoked when the employers learned that Stanfield was on probation, *id.* at 24.

Other evidence at the hearing related to Stanfield's compliance with his obligation to receive mental health counseling. Under a treatment plan dated February 26, 2003, which Stanfield had signed, he was obligated to attend weekly group therapy sessions at the Frayser Family Counseling Center and biweekly intensive therapy sessions one-on-one with Sharon Davis, a counselor at the center. No staff members

---

[1] Stanfield initially told his probation officer that his aversion to the fast food industry was a result of his being a vegetarian, *see* HOV Tr. at 61, but he later testified that he would take a job "putting pepperoni on a pizza" if the alternative was going to jail, *id.* at 93.

from the center testified at the hearing; although the court had issued a subpoena (at Stanfield's request) for the testimony of Seth McCaskill, a counselor who led the group therapy sessions, McCaskill received the subpoena just one day before the hearing and was unable to travel from Memphis on such short notice. HOV Tr. at 2–3. The evidence on Stanfield's compliance with this condition thus came primarily from Probation Officer Shaw, who testified about information he received from Davis. Over the defense's objection on double-hearsay grounds, Shaw testified that Davis had told him what McCaskill had told her about Stanfield's allegedly disruptive behavior at one of the group therapy sessions. *Id.* at 14–16. Shaw then stated that Davis had notified him on April 21, 2003 that Stanfield "had not yet ever presented himself to her" for the biweekly individual counseling sessions. *Id.* at 16. Later that day, Stanfield went to the center and met with Davis. According to Davis's account of the meeting, Stanfield became "defensive" when reminded of his obligation to meet with her for individual sessions, and "began escalating" to the point where she ended the discussion and asked him to leave. Letter from Davis to Shaw (Apr. 22, 2003). One week later, Davis sent a memorandum to Shaw with a more detailed description of what had transpired during the meeting, stating that "[t]he more I attempted to advise Mr. Stanfield [about] his requirements of treatment, the more verbally defiant he became." Davis Memo at 2. The memorandum formally notified Shaw that Stanfield's treatment at the center had been terminated. *Id.* at 3.

The final subject of testimony at the hearing was Stanfield's obligation to submit to random drug testing. Shaw testified that Stanfield failed to appear for a drug test on March 13, 2003 — apparently because Stanfield did not call the probation office as required each evening to hear a recording with instructions on whether a drug test would be held the next day. *See* HOV Tr. at 9–11, 41–42; Letter from Shaw to Stanfield (Feb. 24, 2003) (instructions for drug screening). On the morning of March 14, Shaw explained,

Stanfield called in dismay at having missed the drug screen the previous day; he came in later on the 14th and tested negative for illegal drugs. HOV Tr. at 11.

At the end of Shaw's direct testimony, Stanfield's counsel moved for production of his statements pursuant to Federal Rule of Criminal Procedure 26.2, which is analogous to the Jencks Act, 18 U.S.C. § 3500, *see* FED. R. CRIM. P. 26.2 Advisory Committee note (1979) (Rule "place[s] in the criminal rules the substance of" the Jencks Act). Rule 26.2(a) provides that after a witness has testified, the opposing party may move the court to order the party who called the witness to turn over "any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Shaw gave to Stanfield's counsel what she described at the time as "a very thick stack of papers," HOV Tr. at 31, and later described as "a stack of paper between one and two inches high," Appellant Br. at 22. Stanfield's counsel (assisted by co-counsel) was then given a total of nine minutes to review the papers. HOV Tr. at 31–32. At the end of that time, counsel stated that she "ha[d] not had sufficient time to review" the documents, which were "voluminous" and "essential to the issues before the court." *Id.* at 32. The court nonetheless ordered counsel to begin the cross-examination of Shaw, stating that because the direct examination had taken twenty-two minutes, the cross-examination would be limited to the same amount of time. *Id.* at 32–33. The court eventually allowed the cross-examination to run longer, *see id.* at 52, but admonished counsel to "[f]inish up," *id.* at 56, 63; *see also id.* at 58 (counsel apologizing for interrupting the witness, stating "I am a little conscious of the time."). At the end of the cross-examination, counsel stated, "I have nothing further, Your Honor, although I would like briefly to restate for the record that I feel that without having had sufficient time to review all the papers that my cross-examination was not as effective and [a]s wide-ranging as it should have been and could have been." *Id.* at 65.

Only three of the conditions of Stanfield's probation — the employment condition, the mental health treatment condition, and the drug screening requirement — were addressed at the May 15 hearing, despite the pendency of Stanfield's motion to clarify the internet condition. *See id.* at 2.[2] The district court concluded that the evidence of Stanfield's non-compliance with the employment condition was "more or less in equipoise except with respect to this requirement that he report in advance employment that he secures." *Id.* at 123. With respect to the mental health counseling, the court found that Stanfield "most assuredly did not comply with this condition and he is in violation of this and it is willful," *id.* at 122; regarding the drug screening requirement, the court concluded that Stanfield's failure to comply with the March 13 drug screen was not willful, *id.* at 120. In a subsequent hearing, the court revoked Stanfield's probation based on the violations of the employment and mental health counseling conditions, emphasizing that this action was "not predicated on any one violation" and that "the presence or the absence of any one would not materially influence" the court's decision. Sentencing Tr. at 10. The court sentenced Stanfield to nine months in prison, and specified a series of conditions that would govern his subsequent release, including a revised restriction on his use of the internet. The court imposed the revised internet restriction without providing notice to or hearing argument from the defendant. *Id.* at 2, 15–18.

## II.

### A. Internet Condition

We begin with Stanfield's challenge to the internet condition that will apply during his supervised release. The revised condition states:

The defendant's use of the internet is limited as follows:

---

[2] The government had by then conceded that the internet ban was "overly broad, given the circumstances of this case." Gov't Response to Def. Mot. for Clarification at 2.

a) The defendant may use the internet as any employer legally directs, so long as he has no access to personal information including bank account numbers, credit card numbers, social security numbers and birth dates.

b) The defendant may not view and use internet sites that provide personal information as described in [section (a)].

c) Within these parameters, the probation office may alter this limitation on internet use as needed to ensure that it is clear and tailored to prevent further identity thefts.

d) The defendant must permit the probation office to search his e-mail accounts and his computer, including the drives and storage devices, at any time. If the defendant uses the computer or e-mail account of a friend or employer, he must first obtain permission from that person for a possible search of the computer, including the drives and storage devices, or the e-mail account.

The imposition of a term of supervised release after imprisonment is authorized by 18 U.S.C. § 3583. Subsection (d) of that provision specifies that the court may order any condition of supervised release "it considers to be appropriate," to the extent the condition is "reasonably related" to the nature and circumstances of the offense and the history and characteristics of the defendant, and to the need to deter crime, to protect the public from further crimes of the defendant, and to provide needed training, medical care, or other correctional treatment to the defendant. 18 U.S.C. § 3583(d)(1). The condition also must entail "no greater deprivation of liberty than is reasonably necessary" to provide adequate deterrence, to protect the public, and to meet the defendant's vocational and medical needs. *Id.* § 3583(d)(2).

The parties and amicus American Civil Liberties Union of the National Capital Area dispute whether the internet re-

striction comports with the requirements of 18 U.S.C. § 3583 and the First Amendment. Amicus tells us that seven federal appellate decisions have upheld internet restrictions, while six have struck them down. *See* Amicus Br. at 14 & n.10. The government argues that the cases on which defendant and amicus rely are distinguishable because of the greater breadth of the restrictions at issue in those cases. *See* Appellee Br. at 56–57.

Before we can assess such arguments, we need to know the reach of the restriction at issue. Stanfield and amicus contend that the condition is vague in significant respects. It does not state explicitly that Stanfield may use a computer *only* as "any employer legally directs," but at oral argument Stanfield's counsel — who was also his counsel at the hearing when the condition was imposed — stated that she believed the condition included that limitation. Oral Argument at 07:55; *see also* Reply Br. at 20 (construing section (a) of the condition as allowing internet use only at work). Stanfield also argues that the condition is overly expansive, and offers the example of newspapers' internet sites, which typically include birth dates in obituaries or death notices. On its face, with its ban on accessing any site that contains birth dates, the restriction could bar Stanfield from reading an encyclopedia or a newspaper online (even though he could freely buy a print edition of these materials and obtain the same information).

The government offers a reading of the restriction that does not suffer from the vagaries that Stanfield alleges. In the government's view, it is "obvious" that Stanfield is free to have a personal computer and e-mail account, because section (d) refers to "his e-mail accounts" and "his computer" in a context distinct from the employment realm, immediately providing for *additional* steps to be taken when the computer belongs to an employer or friend. Appellee Br. at 55. At oral argument, in response to questioning, government counsel represented that the restriction would not preclude Stanfield from accessing newspapers online, despite the fact that such sites contain prohibited information such as birth dates. Oral Argument at 35:49.

We are reluctant to address the validity of the internet restriction in the absence of a clearer understanding of its scope; we need more solid footing before deciding where we stand. The evolutionary process the internet restriction has undergone in this case — involving challenges by the defendant, redefinition by the district court without providing notice to or hearing argument from the defendant, and sporadic concessions by the government — has culminated in a lack of clarity about what exactly is before us. That is problematic enough as a general matter; neither the defendant nor the probation office and district court should have to consult the judgment, the briefs before this court, and the transcript of oral argument to determine the scope of the condition. Subsection (f) of 18 U.S.C. § 3583 specifies that:

> The court shall direct that the probation officer provide the defendant with a written statement that sets forth all the conditions to which the term of supervised release is subject, and that is sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required.

*See also United States v. Simmons*, 343 F.3d 72, 81 (2d Cir. 2003) ("Due process requires that the conditions of supervised release be sufficiently clear to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly") (internal quotation marks and citations omitted).

But quite apart from these concerns, the confusion over the scope of the internet restriction counsels restraint on our part before attempting to consider the validity of the restriction under 18 U.S.C. § 3583 and the First Amendment. *See City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 495 (1986) ("We do not think . . . that it is desirable to express any more detailed views on the proper resolution of the First Amendment question . . . without a fuller development of the disputed issues in the case."). Although section (c) of the condition authorizes the probation office to clarify and tailor the restriction, the extent of the confusion here, and the First Amendment concerns that this case implicates,

render that option inadequate. *See United States v. Scott*, 316 F.3d 733, 736 (7th Cir. 2003) (Easterbrook, J.) (terms of supervised release should be precise, because open-ended delegations to probation officers "create opportunities for arbitrary action — opportunities that are especially worrisome when the subject concerns what people may read"). We accordingly remand to allow the district court to clarify the scope of the restriction. *See United States v. Smith*, 332 F.3d 455, 462 (7th Cir. 2003) (remanding for clarification of ambiguous condition of supervised release); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 514 (1988) (remanding to court of appeals for clarification of its findings); *CSX Transp., Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996) (remanding for district court to clarify the grounds for its ruling). We leave to the district court in the first instance the appropriate means of addressing the confusion that has arisen.

## B.   Production of Jencks Material

Stanfield also argues that the district court erred in handling his request for the production of certain documents before the cross-examination of Probation Officer Shaw. Under the procedural rule that governs Jencks material, the prosecution was required to produce, on motion of the defendant, "any statement of the witness" that was "in [its] possession and that relate[d] to the subject matter of the witness's testimony." FED. R. CRIM. P. 26.2(a); *see also* FED. R. CRIM. P. 32.1(e) (making Rule 26.2(a)–(d), (f) applicable to probation revocation hearings). The defense made a timely motion for the production of the documents, HOV Tr. at 27, and Shaw began to look through the documents he had brought to the hearing. The district court ruled on two occasions that certain documents were not producible. First, Shaw offered to turn over certain unidentified documents, saying, "This is stuff which is not part of this file but was brought with me. You are welcomed to see it." HOV Tr. at 29. The prosecution did not object to the production of the documents, but the court immediately stated, "If it's not part of your file she is not welcome to see it. Now, let's speed this up please." *Id.* Shaw continued leafing through the materials, describing

each document; at one point he stated that some of the documents were "confidential memorandums to the court." *Id.* at 29–30. Again without waiting for any objection from the prosecution, the court ruled that "[t]hese memorandums to the court are not producible. Speed it up." *Id.* at 30.

The district court had an "affirmative duty," *Saunders v. United States*, 316 F.2d 346, 349 (D.C. Cir. 1963), to "engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production," *United States v. North Am. Reporting, Inc.*, 740 F.2d 50, 55 (D.C. Cir. 1984); *see United States v. Holton*, 116 F.3d 1536, 1546 (D.C. Cir. 1997) (same). Neither the Jencks Act nor Rule 26.2 specifies a particular procedure for determining whether documents need to be produced, but the typical practice in the case of an objection to production is for the district court to examine the documents in camera or to question the witness about them. *See Goldberg v. United States*, 425 U.S. 94, 108 (1976) ("We have recognized that a Government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are . . . producible"); *Palermo v. United States*, 360 U.S. 343, 354 (1959) ("we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination"); *North Am. Reporting*, 740 F.2d at 55; *see also* FED. R. CRIM. P. 26.2(c) ("If the party who called the witness claims that the statement contains information that is privileged or does not relate to the subject matter of the witness's testimony, the court must inspect the statement in camera."). Here the government did not object, because there was no occasion for it to do so — the district court ruled against production of the "stuff which is not part of this file" and the "confidential memorandums to the court" without awaiting an objection, without inquiring further into the nature of the material, and without examining the documents themselves.

This course puts us in the position of having to review whether it was proper to decline to order production of the documents without knowing very much about them. We do not know, for example, what the "stuff which is not part of

this file" is, or why Shaw had it with him on the stand if it was indeed "not part of this file." Nor is the nature of the memoranda to the court clear. With respect to both categories of material, there is a dispute over the pertinent question of whether the documents satisfy the criterion of Rule 26.2 that they be in the possession of the attorney for the government at the time of the hearing, *see* FED. R. CRIM. P. 26.2(a). The government argues that there is "absolutely no indication" that the confidential memoranda from Shaw to the court were ever in its possession, Appellee Br. at 24, but Stanfield contends that there is "clear evidence that at least some part of the probation officer's file was in the possession of the prosecutor at some point before the hearing," Reply Br. at 6. Stanfield argues that several of the government's exhibits at the hearing — letters from Shaw to Stanfield and letters from the Frayser counselors to Shaw — must have been drawn from Shaw's files, *see* HOV Tr. at 6–7, 8, 11, 14, 19–20, suggesting that government counsel had access to that file.

If the documents were in the record on appeal, we would have to decide whether to examine them ourselves to determine whether they should have been produced. *Compare, e.g.*, *United States v. Chitwood*, 457 F.2d 676, 678 (6th Cir. 1972) (district court "wisely ordered the reports to be made part of the record, sealed for appellate review. . . . We have examined [them] carefully"), *with United States v. Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980) ("we decline the district judge's invitation to inspect the documents ourselves, and, instead, remand the case"), *and United States v. O'Brien*, 444 F.2d 1082, 1087 (7th Cir. 1971) (remanding for district court to examine sealed documents). Given that the documents are not available to us, we have no occasion to depart from the "general rule" that "the initial determination of whether . . . documents constitute producible statements under the [Jencks Act] should be made in the district court." *North Am. Reporting*, 740 F.2d at 56; *see also Goldberg*, 425 U.S. at 109 n.15 (examination of documents to determine whether they are producible is "initially a task for the District Judge"); *Truong Dinh Hung*, 629 F.2d at 920 (district court's "familiar[ity] with the other Jencks Act material" makes it

"better equipped than we to decide whether any Jencks Act statements included within the documents are merely cumulative").

On remand, the district court should take such steps as are necessary to fill in these record deficiencies to allow adequate review of Stanfield's claims under Rule 26.2(a). Whether through examination of the documents at issue or through other means, the court should develop a record concerning whether the documents were producible under the Rule. *See United States v. Cole*, 617 F.2d 151, 153 (5th Cir. 1980); *Saunders*, 316 F.2d at 349. If the court concludes that any of the withheld documents should have been produced, it must then determine whether the error was harmless. *See Goldberg*, 425 U.S. at 111; *North Am. Reporting*, 740 F.2d at 56; *see also Holton*, 116 F.3d at 1547; *United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 (D.C. Cir. 1991). As we have noted, the harmless-error doctrine must be "strictly applied" in Jencks cases, *North Am. Reporting*, 740 F.2d at 56 n.8 (citing *Goldberg*, 425 U.S. at 111 n.21), and the court "cannot 'speculate whether [the material] could have been utilized effectively'" at the revocation hearing. *Id.* (quoting *Clancy v. United States*, 365 U.S. 312, 316 (1961)). In accordance with this court's approach in *North American Reporting*, 740 F.2d at 56, we do not vacate the district court's findings of probation violations; rather, if the court finds error that was not harmless, it should vacate its judgment and conduct a new hearing. *See Goldberg*, 425 U.S. at 111–12; *Saunders*, 316 F.2d at 350.

## C. Time Allotted to Review Jencks Material

With respect to the Jencks material that *was* provided at the hearing, Stanfield argues that the court abused its discretion in granting his counsel only nine minutes to review what counsel described as "a very thick stack of papers." HOV Tr. at 31. The applicable rule provides that "[t]he court may recess the proceedings to allow time for a party to examine the statement and prepare for its use." FED. R. CRIM. P. 26.2(d). Stanfield relies primarily on *United States v. Hinton*, 631 F.2d 769, 782 (D.C. Cir. 1980), in which this court

held that trial counsel's failure to request the recess to which she was entitled under Rule 26.2(d) deprived the defendant of his right to effective assistance of counsel. Of greater importance to this case — because Stanfield's counsel did request and receive a recess (albeit a short one) — is the *Hinton* court's statement that if the defense counsel had requested a recess, "a refusal by the court to allow *sufficient* time for review would have been appealable as an abuse of discretion." *Id.* at 781 (emphasis added).

*Hinton* thus establishes (unremarkably) Stanfield's right to an appeal on this issue, but provides no guidance on how much time would be sufficient to satisfy the abuse-of-discretion standard. For that, Stanfield points to *United States v. Holmes*, 722 F.2d 37 (4th Cir. 1983), in which the Fourth Circuit held that the trial court abused its discretion in allowing the defendant only sixteen minutes to review Jencks material that had been provided to counsel on a Sunday morning one day before the trial began. *See id.* at 40, 41. "[T]he material was a stack of paper at least eight inches thick, including a thousand pages of testimony obtained from ten witnesses, a forty-five minute tape recording and other documents;" the court noted that a single reading of the material by an experienced attorney took twenty-four hours. *Id.* at 40. In holding that the recess was inadequate, the court emphasized that the defendants "had only the minimum notice that due process requires of the charges against them," and that their need for time to examine the material was thus "greater than in the usual case." *Id.* at 41. This case is manifestly distinguishable from *Holmes*. Quite apart from the fact that the volume of material here is smaller — the stack of papers is at most one-quarter the size, and there is no evidence that the material included a lengthy audiotape — this case does not include a notice problem analogous to the one that the Fourth Circuit confronted: the Violation Report provided a detailed explanation of the alleged violations and the facts underlying each of them. Violation Report (Apr. 28, 2003), at 2–4.

Rule 26.2(d) compels the district courts to exercise discretion in balancing the need for adequate time to examine

Jencks material against the need to avoid undue delay in the midst of a proceeding while a witness is on the stand. The permissive language of the Rule — "[t]he court *may* recess the proceedings" (emphasis added) — indicates that district judges have ample latitude in striking that balance. *See Sendejas v. United States*, 428 F.2d 1040, 1046 (9th Cir. 1970) (given that the Jencks Act "does not state how much time should be allowed," "the trial judge in his discretion has the right to determine how much time is reasonably needed"). The district court cannot be required to wait until defense counsel is satisfied that review of the Jencks material is complete; such a procedure would transfer control over the timing of proceedings from the district judge to the defense. The district court must unavoidably draw the line somewhere, and is well equipped to do so. *See Palermo*, 360 U.S. at 353 (decisions on "procedural and evidentiary matters" should rest "within the good sense and experience of the district judge . . ., and subject to the appropriately limited review of appellate courts").

Commentators and practitioners have long been aware that the time allotted for review of Jencks material is often relatively brief. *See* American Bar Ass'n, Standards for Criminal Justice: Discovery and Trial by Jury, Standard 11.2–1(a) cmt., at 20–21 (3d ed. 1996) ("Some federal courts have criticized [the timing of Jencks disclosure] as contrary to the interest of justice and the orderly administration of the judicial system"). Indeed, complaints about inadequate time for examining Jencks material are nearly as old as the Jencks Act itself. *See* Junior Bar Section of Bar Ass'n of District of Columbia, Conference Papers on Discovery in Federal Criminal Cases (1963), *reprinted in* 33 F.R.D. 47 app. at 122 (1963) (noting "widespread dissatisfaction with the amount of time afforded to defense counsel to inspect and reflect on the contents of Jencks statements in the midst of a trial"). But we note that Stanfield's counsel relied on Shaw's notes of his meetings with Stanfield — which were disclosed after Shaw's direct testimony — on two occasions during cross-examination, *see* HOV Tr. at 34–35, 39–40, indicating that she was able to use the opportunity to review the material to

some advantage.  *See United States v. Mitchell*, 777 F.2d 248, 255 (5th Cir. 1985).

A district court must avoid undue delay in proceedings, but must also ensure that the right provided by Rule 26.2 is not rendered meaningless by expedition; a prompt proceeding is good but a fair one is necessary, and excessive zeal to minimize delay can be short-sighted, precipitating an appellate challenge that could have been avoided.  No one would accuse the district court here of being overly generous in affording counsel time to review the documents produced after Shaw's testimony; indeed, the court flirted with the outer limits of its discretion, but we cannot conclude that it abused that discretion.[3]  Given that we are remanding the case for the district court to determine whether defense counsel received all the Jencks material to which she was entitled, however, the district court may want to take the opportunity to review the Jencks material that was produced and reassess whether nine minutes was a sufficient amount of time for Stanfield's counsel to review it.  Of course, if the court finds that additional documents should have been produced, and that such error was not harmless, it will have to reassess the amount of time counsel reasonably needs to review all the material she is entitled to see.

### D.   Time Limitation on Cross–Examination

Stanfield's next attack on the procedure used at the hearing focuses on the district court's limitation of the time allowed for the cross-examination of Shaw.  The record does

---

[3] This conclusion should not be read to endorse the government's argument, Appellee Br. at 26–27, that the opportunity that Stanfield was apparently given to request documents from the probation officer's file *prior* to the hearing, *see* HOV Tr. at 27–28, affects the determination of how much time (if any) should be allotted for review of documents produced at the hearing.  Such opportunities are frequently afforded to mitigate the difficulties associated with the timing of production under the Rule.  *See* 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 438, at 223 (3d ed. 2000).  Here, however, the opportunity was conveyed not to Stanfield's counsel, but only to the represented Stanfield himself.

not indicate precisely how long the cross-examination continued beyond the initial twenty-two-minute limitation; it shows only that the limit was reached after twenty transcript pages of testimony and that testimony continued for thirteen more pages. *See* HOV Tr. at 32, 52, 65. Stanfield argues that even though the announced limit was ultimately exceeded, the court's exhortations to defense counsel to "finish up," *id.* at 56, 63, caused counsel to be "pressured and distracted," Appellant Br. at 17, and amounted to a denial of Stanfield's right to confront the witness against him.

A probationer facing revocation is entitled to "an opportunity to . . . question any adverse witness." FED. R. CRIM. P. 32.1(b)(2)(C); *see also Morrissey v. Brewer*, 408 U.S. 471, 488–89 (1972) (holding that a right to confrontation exists in parole revocation proceedings); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (extending *Morrissey* to probation revocations). Although *Morrissey* states explicitly that a revocation hearing should not be "equate[d] . . . to a criminal prosecution in any sense," 408 U.S. at 489, we need not address the precise extent of the confrontation to which a probationer is entitled post-*Morrissey* because the cross-examination here was adequate. *Cf. United States v. Green*, 670 F.2d 1148, 1154 (D.C. Cir. 1981) (right of cross-examination applies at a suppression hearing irrespective of whether it "deriv[es] from the fundamental concepts embedded in the Due Process Clause or [is] implicit in the rules governing federal criminal proceedings").

In *United States v. Slade*, 627 F.2d 293 (D.C. Cir. 1980), which arose from an adversary trial, the district court limited the defendant's cross-examination of a government witness to roughly forty-five minutes. *Id.* at 309. The court concluded:

> [T]he time limitation may have placed a degree of pressure on [defendant]'s counsel, who then indicated that the schedule interfered with his preparation and concentration, [but] under the circumstances of these cases and the matters explored, the restriction of cross-examination was not an abuse of discretion . . . .

*Id.* In this case, defense counsel likewise indicated that she felt pressured by the time limitation. *See, e.g.*, HOV Tr. at 58 ("I'm sorry to be interrupting you, I am a little conscious of the time."). At the end of the cross-examination, however, counsel's objection was focused on the time allotted to review the Jencks material, not on the overall duration of the cross-examination. *Id.* at 65 ("I have nothing further, Your Honor, although I would like briefly to *restate* for the record that I feel that without having had sufficient time *to review all the papers* . . . my cross-examination was not as effective and [a]s wide-ranging as it should have been") (emphases added). Moreover, the transcript reflects a reasonably detailed discussion of the evidence relating to the alleged violations. *See United States v. Anderson*, 881 F.2d 1128, 1139 (D.C. Cir. 1989) (court "may limit cross-examination only after there has been permitted . . . a certain threshold level of cross-examination which satisfies the constitutional requirement") (quoting *United States v. Christian*, 786 F.2d 203, 213 (6th Cir. 1986)) (internal quotation marks omitted). Again, although we do not endorse excessive zeal in minimizing delay, we cannot conclude that the district court violated Stanfield's rights in limiting the cross-examination.

### E.  Admission of Hearsay Testimony

Stanfield also argues that the district court erred in receiving Shaw's testimony to the extent that it included hearsay statements of Sharon Davis. In several instances, Shaw testified about what Davis had said during telephone conversations with him. *See* HOV Tr. at 15–16, 18–19. The court also accepted into evidence several letters that Davis wrote to Shaw. *See id.* at 19–20. At one point the court even permitted Shaw to testify, over an objection from Stanfield, about Davis's "appreciation" of what had happened when Stanfield attended a group therapy session led not by Davis but by Seth McCaskill. *Id.* at 16. Stanfield urges that before receiving such hearsay evidence, the court was obliged to conduct a balancing test, weighing Stanfield's right to confront the declarant against the government's asserted grounds for foregoing confrontation. *See United States v.*

*Bell*, 785 F.2d 640, 642 (8th Cir. 1986); *see also United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994); FED. R. CRIM. P. 32.1 Advisory Committee note (2002) (court should "balance the person's interest in the . . . right to confrontation against the government's good cause for denying it").

Notably, however, in each of the cases on which Stanfield relies, the party challenging the hearsay evidence raised a timely objection to its introduction. *See, e.g.*, *United States v. Comito*, 177 F.3d 1166, 1168 (9th Cir. 1999); *United States v. O'Meara*, 33 F.3d 20, 20 (8th Cir. 1994); *Frazier*, 26 F.3d at 112; *United States v. Zentgraf*, 20 F.3d 906, 908 (8th Cir. 1994); *Bell*, 785 F.2d at 643 n.3; *see also United States v. Pratt*, 52 F.3d 671, 677 n.4 (7th Cir. 1995) ("The requirement of balancing . . . generally involves an initial request by the defendant to cross-examine adverse witnesses"). Here, Stanfield did not object to any of the hearsay attributable to Davis except the single double-hearsay statement (Shaw's testimony about what McCaskill said to Davis). Stanfield urges that counsel's statement during an *ex parte* bench conference at the beginning of the hearing — "I'm entitled to subpoena witnesses. I want Ms. Davis," HOV Tr. at 4 — should be read as an "assert[ion]" of his "right to test her statements through cross-examination." Reply Br. at 11. But such a general statement made at a different point in time from the production of hearsay evidence — indeed, before counsel could even have known that the testimony would include hearsay — cannot be construed as a pertinent objection.

We therefore review the admission of the bulk of the hearsay evidence — all except the double hearsay — for plain error. *See* FED. R. CRIM. P. 52(b). Our plain-error review is informed by the holdings of a number of circuits that, under *Morrissey*'s relaxed standard for confrontation, hearsay evidence may be admitted in probation revocation hearings if it bears sufficient indicia of reliability. *See, e.g.*, *United States v. Redd*, 318 F.3d 778, 783–84 (8th Cir. 2003); *United States v. Simmons*, 812 F.2d 561, 564 (9th Cir. 1987); *Egerstaffer v. Israel*, 726 F.2d 1231, 1234 (7th Cir. 1984); *United States v. Penn*, 721 F.2d 762, 765 (11th Cir. 1983); *see generally* FED. R. EVID. 1101(d)(3) (Rules of Evidence do not apply in proba-

tion revocation proceedings). The district court could have concluded that Davis's statements introduced via Shaw were fairly reliable, insofar as they were corroborated by the undisputed fact that Stanfield had been expelled from the counseling program. The court thus did not commit plain error.

With respect to the double hearsay, to which Stanfield did object, we find that the district court erred in failing to conduct the balancing described in the note to Rule 32.1. The error was, however, harmless: the double hearsay consisted of Shaw testifying as to Davis's "appreciation" of information from McCaskill, and written notes taken by McCaskill had already been entered into evidence (without objection) and discussed in detail. HOV Tr. at 14–16. Shaw characterized Davis's statements as "elaborat[ing] a little further" on the information in McCaskill's notes, *id.* at 16, so the double hearsay was largely repetitive of the notes that had already been admitted. *See United States v. Smith*, 964 F.2d 1221, 1224 (D.C. Cir. 1992); *United States v. DeLoach*, 654 F.2d 763, 771 (D.C. Cir. 1980).

## F. Absence of McCaskill from the Hearing

The last of Stanfield's procedural arguments is that the court violated his right to present evidence on his behalf, *see* FED. R. CRIM. P. 32.1(b)(2)(C), by "refusing to compel" the presence of Seth McCaskill as a witness for the defense. Appellant Br. at 32. We reject the government's rejoinder that the subpoena for McCaskill was itself an abuse of process insofar as it was requested on April 9, only six days before the hearing. *See* Appellee Br. at 34 n.17. The timing of Stanfield's request is easily explained: his counsel received the Violation Report from the probation office only nine days before the hearing, *see* HOV Tr. at 101, and the order converting the status hearing to a revocation hearing was issued only three weeks before the hearing date. Nonetheless, we conclude that Stanfield's argument must fail.

When the court gave Stanfield the opportunity to elicit testimony from McCaskill by telephone, his counsel replied, "That's not acceptable to me." *Id.* at 4; *see also id.* at 69

(court to counsel: "The record will reflect that you're waiving your opportunity to examine this witness."). Counsel did not, however, request a continuance to allow McCaskill to appear. *Cf. United States v. Barker*, 553 F.2d 1013, 1023 (6th Cir. 1977) (trial court erred in denying request for a continuance when witnesses subpoenaed by defense did not appear). By summarily rejecting the option of taking McCaskill's testimony by telephone, counsel foreclosed the development of a record from which we could have evaluated the extent, if any, to which Stanfield's due process rights might have been infringed by the substitution of the telephone examination for live testimony, and whether any infringement would have been harmless in the overall context of the hearing. *Cf. United States v. Jacobs*, 97 F.3d 275, 280–84 (8th Cir. 1996) (court erred in allowing cross-examination of hospitalized witness by telephone at trial, but error was harmless). We decline to engage in an abstract and hypothetical examination of whether telephone testimony would be adequate under *Morrissey* and Rule 32.1(b)(2)(C).

### G. Alleged Vindictiveness of the Court

Stanfield's final argument is that the revocation of his probation was a vindictive response to his challenge to the special condition that (prior to revision) barred him from all use of the internet. *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969), permits a "presumption of vindictiveness" when longer sentences are imposed on retrial, but only when "there is a reasonable likelihood that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Alabama v. Smith*, 490 U.S. 794, 799 (1989) (internal quotation marks and citation omitted). In the absence of such a reasonable likelihood, "the burden remains upon the defendant to prove actual vindictiveness." *Id.* at 799–800 (citing *Wasman v. United States*, 408 U.S. 559, 569 (1984)).

Aside from *Pearce* itself, in which a longer sentence was imposed after a defendant successfully appealed his conviction, the Supreme Court has found a reasonable likelihood of vindictiveness — and thus has applied a presumption of

vindictiveness — in only one other circumstance: when a prosecutor added a new felony charge against a defendant seeking *de novo* review of a misdemeanor conviction. *Blackledge v. Perry*, 417 U.S. 21, 27 (1974). Stanfield urges us to extend the presumption of vindictiveness to situations in which a court revokes probation after a defendant brings a constitutional challenge — in the form of a motion to clarify — against a condition of the probation. Even if the Supreme Court had not indicated that it is "chary about extending the *Pearce* presumption of vindictiveness when the likelihood of vindictiveness is not as pronounced as in *Pearce* and *Blackledge*," *Wasman*, 468 U.S. at 566, we would be disinclined to extend the presumption to a case like the one before us. A motion to clarify is categorically different from a retrial or resentencing that occurs after a defendant has "successfully pursued a statutory right of appeal or collateral remedy," *Pearce*, 395 U.S. at 724. As the Court noted in *Chaffin v. Stynchcombe*, 412 U.S. 17, 27 (1973), "the judge who has been reversed" may have a "personal stake in the prior conviction and [a] motivation to engage in self-vindication;" any such concerns are certainly attenuated, and perhaps even absent, when a judge is himself merely asked to clarify an earlier ruling.

Even if a presumption of vindictiveness did apply in this case, it would be more than adequately rebutted.[4] *See Texas v. McCullough*, 475 U.S. 134, 141 (1986) ("Nothing in *Pearce* is to be read as precluding a rebuttal of intimations of vindictiveness."). The trial court articulated the reasons for its decision to revoke Stanfield's probation, including two violations that the court found to be willful and the severity of

---

[4] For similar reasons, we do not decide whether to review the vindictiveness claim for plain error, as the government urges, or under a stricter standard of review, as Stanfield suggests. No allegation of vindictiveness was raised below, suggesting that plain-error review is appropriate, *see* FED. R. CRIM. P. 52(b), but Stanfield argues that it would be impractical to require defendants to raise claims of vindictiveness before the very court alleged to be acting vindictively. Our holding would be the same under either standard of review.

the underlying offense, as reflected in the initial prison term to which Stanfield could have been sentenced, HOV Tr. at 122–24; *see Wasman*, 468 U.S. at 572 (court "may justify an increased sentence by affirmatively identifying relevant conduct or events that occurred subsequent to the original sentencing proceedings"). Moreover, the court's statement at the initial sentencing — putting Stanfield on notice that "any problems at all and I will hold you accountable . . . . I will revoke your probation and impose a period of incarceration" — roundly defeats any suggestion that it was a vindictive response to the motion to clarify that led to the revocation.

A showing of actual vindictiveness is "exceedingly difficult to make," *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001) (internal quotation marks and citation omitted), and Stanfield has not presented the required "objective evidence" that the court's action was "motivated by a desire to punish him for doing something that the law plainly allowed him to do," *United States v. Goodwin*, 457 U.S. 368, 380 n.12, 384 (1982). The fact that the court converted the scheduled status hearing to a hearing on violation on April 25 (after Stanfield filed the motion to clarify the internet ban) does not show vindictiveness, since the court had already noted Stanfield's violation and informed the probation office *before* Stanfield filed the motion to clarify.

The court's knowledge of Stanfield's internet use during his probation also helps explain why the court stated the following at the hearing on violation:

> All of this business, Mr. Stanfield, is not a game. It is not a game. When I told you not to use the Internet, you went through this whole group of machinations. Do not use the Internet. [Do] not have anybody else use the Internet for you in any way, shape or form. All of this is done in lieu of putting you in prison. You should welcome that kind of condition, given what it is a substitute for.

HOV Tr. at 126. Stanfield argues that the only "machination" the court could have had in mind was Stanfield's motion

to clarify. Appellant Br. at 39. Not at all. In context, it is clear that the court was referring to the continued posting of Stanfield's poetry and e-mail addresses on the internet.[5] As explained in Stanfield's brief, his counsel had advised him that he could give copies of his writing to a friend for eventual posting on the internet; the district court contacted counsel on April 10, 2003 and stated that it considered such action to be an end-run around the internet ban. *See id.* at 4. In sum, Stanfield has fallen far short of the requirements for showing actual vindictiveness.

\* \* \*

For the reasons stated, we remand to the district court for clarification of the condition of supervised release concerning internet use, and for a more considered determination of whether material requested by the defendant pursuant to Federal Rule of Criminal Procedure 26.2 but not produced should have been produced.

---

[5] Moreover, as discussed above, the district court based its decision to revoke Stanfield's probation not on any violation of the internet restriction, but rather on its findings that he had violated the employment and mental health counseling conditions.